PENNSYLVANIA STEEL CO. et al. v. NEW YORK CITY RY. CO. et al.
(and four other causes).

(District Court, S. D. New York. December 18, 1914.)

Nos. 2–19, 2–33, 2–149, 3–37, 3–114.

1. STREET RAILROADS ⬥58 — RECEIVERS — LIABILITY FOR USE OF LEASED LINES.

The receivers for a street railway system, which includes leased lines, unless and until they adopt a lease, are not liable for rent thereunder; but, so long as they operate a leased line without objection from the lessor, they are accountable, on its surrender, only for its net earnings.

[Ed. Note.—For other cases, see Street Railroads, Cent. Dig. § 135; Dec. Dig. ⬥58.]

2. STREET RAILROADS ⬥58—RECEIVERS—SURRENDER OF LEASED LINE—ACCOUNTING FOR EARNINGS.

In computing such earnings, where such line is one of a large number comprising the system, and is operated in connection with the others, there is no more practical method than to prorate the total receipts on a mileage basis, and the general operating expenses on a car mileage basis.

[Ed. Note.—For other cases, see Street Railroads, Cent. Dig. § 135; Dec. Dig. ⬥58.]

3. STREET RAILROADS ⬥49—RECEIVERS—SURRENDER OF LEASED LINE—ACCOUNTING WITH LESSOR—CONSTRUCTION OF LEASE.

Under a provision in a lease of a street railway line requiring the lessee, on termination of the lease, to return the equipment, except what has

---

⬥For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

passed from existence by death or destruction, and also substitutes, increments, and additions, where motors in use in electric cars were replaced by the lessee by new and improved patterns, the lease cannot be construed to require receivers for the lessee to return, not only the substituted motors, but the old ones also; but, on surrendering the property to the lessor, they are required only to return the cars with the new motors therein, in the condition in which they received them.

[Ed. Note.—For other cases, see Street Railroads, Cent. Dig. §§ 125, 126; Dec. Dig. ☞49.]

4. STREET RAILROADS ☞58—RECEIVERS—SURRENDER OF LEASED LINE—ACCOUNTING WITH LESSOR.

In such case, where the receivers of the system which included the leased line, after taking possession of such line, and before electing not to adopt the lease, expended money out of the general funds of the receivership in electrifying a portion of the line they are entitled on an accounting with the lessor, to an offset of the amount of such expenditure.

[Ed. Note.—For other cases, see Street Railroads, Cent. Dig. § 135; Dec. Dig. ☞58.]

In Equity. Suit by the Pennsylvania Steel Company and another against the New York City Railway Company and the Metropolitan Street Railway Company, with four other causes. On claim of the Second Avenue Railroad Company and George W. Linch, receiver, against receivers of defendant Metropolitan Street Railway Company. Recommitted to special master.

Following are the opinions of William L. Turner, Special Master:

### Use and Occupation Proceeding.

Counsel for the claimant receiver urges that for the whole period of use and occupation of Second Avenue properties from September 24, 1907, to November 13, 1908, by the receivers of the Metropolitan Company, the claimant is entitled to have its compensation paid on the basis of the stipulated rentals. The replicant says that this question is not referred. Subdivision (6) of the order of reference, as amended by the two subsequent orders, is as follows:

(6) What amounts, if any, the New York City receivers and the Metropolitan receivers should pay over to the Second Avenue Company on account of net income from the operation of the property of the Second Avenue Railroad Company, after deducting all proper charges against such net income?

This language is such as to suggest a doubt as to whether *unpaid* installments of the rentals reserved in the Second Avenue-Metropolitan lease which accrued during this period are within the scope of the reference, although the opinion of the court in pursuance of which the order was entered apparently asks an expression of opinion from the master. The contention of claimant respecting these unpaid installments is that it is legally entitled both to rentals paid and unpaid during the period, although the amount is concededly much in excess of the net income from operation for that period, which would make any inquiry into net profits from operation wholly unnecessary, if it be sound. The right of the claimant, under the language quoted, to retain installments of rentals voluntarily paid by the receivers under instruction from the court, is, however, clearly within its scope, because it involves a determination as to whether such payments are "proper charges" against that *net* income which is what the replicant receiver is claiming them to be.

If any expression of opinion be invited as to claimant's right to rentals for the period not paid, I should say that the declaration of the Circuit Court of Appeals for this circuit in the opinion just handed down since this case was submitted here settles it adversely. Respecting this matter the court says: "The subsidiary lessors of lines to the Metropolitan Company were in

a position to re-enter their properties whenever default was made, but did not do so. They acquiesced in the operation of these lines by the receivers until the receivers returned them. The termination of these leases is, therefore, fixed at these dates respectively. During the period of experimental operation, the receivers operated these lines for the benefit of the lessors; they being entitled to the net profits, if any, and obliged to bear the deficiency, if any. Termination of Lease Proceeding, 198 Fed. 725, 117 C. C. A. 503." Pennsylvania Steel Co. v. New York City R. Co., 216 Fed. 463, 132 C. C. A. 518.

In the termination of lease proceeding the court considered substantially all of the cases relied on by claimant, with the possible exception of the Sunflower Oil Co. Case, 142 U. S. 313, 12 Sup. Ct. 235, 35 L. Ed. 1025. That was a case where the net earnings (from freights) exceeded not only expenses, but rentals as well, and to these, as was held, the lessor became entitled, which is in accordance with the rule as above expressed, when applied to the particular facts of that case. In any event, it must now be regarded as settled in these litigations that default was notice to the lessor, and that the operation of the road by the receivers during the period defaulted on must be deemed to have been carried on with its acquiescence, subjecting its property to whatever loss might result, and if less than rentals reserved, entitling it only to net profits, if any.

The receivers, however, did not default until June 1, 1908, after upward of eight months of experimental operation, and their demand for a credit of the amounts paid under the lease during this time, suggests a question which is not only within the order of reference, but has not been settled in their favor by anything that the courts have decided in these proceedings, as I read those decisions. If this credit is to be allowed, it exceeds the net profits admitted by the receivers, and is but some $7,000 less than that demanded by the claimant for the whole period of occupation. The circumstances under which these payments were made were briefly these:

When, back in October, 1907, application was made to make the receivership permanent, the court in its opinion on that application, after referring to the importance of preserving the system as a unitary system, which involved the payment of rentals under underlying leases, default in which might result in forfeiture of the line involved, and after referring to the necessity of that investigation and experience, upon which reports from the receivers essential to a complete view of the situation might be based, said: "For the present, therefore, the receivers will continue to pay such rentals and mortgage interest." So, further, it said: "Before default is made in any case petition will be filed, setting forth all the facts bearing on the question, and asking instructions, and a day will be fixed on which not only parties to the suit, but all in any way interested, could be heard as to the most equitable and wisest course to pursue." (C. C.) 157 Fed. 446. The decree entered provided, what had been provided in almost identical language in the order appointing the temporary receivers, that "they are authorized in their discretion from time to time out of the funds in their hands to pay the expenses of operating the said properties and executing their trusts. * * * Also, with the approval of this court, to pay all taxes and assessments upon the said properties or any part thereof and all such rentals and installments as may fall or become due for the use of any portion of said railroads and other property."

It is, of course, true that neither the expressions in the opinions nor the orders themselves were such as to justify a belief that the rentals would continue to be paid indefinitely, but, exercising the discretion reposed in them, the receivers did pay rentals and interest until they defaulted on the rental payment due June 1, 1908, and as long as they continued to do that it is clear that the claimant was hardly in a position to demand its property, although a demand at any time would doubtless have resulted either in prompt surrender or a definite adoption of the lease. As late as March 7, 1908, the receivers, on their application for leave to issue receivers' certificates annexed to their petition a schedule of accruing interest and rental payments, among which were payments to accrue to the Second Avenue Company as late as July, 1908, respecting which schedule the petition stated "in our judgment

it is advisable that all these fixed charges should be paid as they accrue. So far as we can now determine it is inadvisable to default on any of them because the revenue derived from the operation of the various lines seems sufficient to meet such charges. In other words, the lines are fully self-supporting, and it seems inadvisable under these circumstances from our standpoint to keep the present operating system intact." Subsequently, and on April 28, 1908, they paid an installment of interest which was their last payment in the nature of a rental payment.

These payments, made under the circumstance disclosed and by instruction of the court, were, I think, voluntary payments which cannot be recovered back.. The opinion of the court in pursuance of which the order of reference was entered contains a passage in the light of which that subdivision above quoted under which this inquiry has been conducted must be construed. It says: "The case is within the principles enunciated in Quincy R. R. v. Humphreys, 145 U. S. 82 [12 Sup. Ct. 787, 36 L. Ed. ·632]; but receivers should account for whatever receipts came into their hands from the operation of lessor's road *during the period for which no rent has been paid,* deducting whatever is properly chargeable against the same" (italics mine). This language clearly recognizes the right of claimant to retain rentals actually paid, and confines the inquiry as to net profits to the period during which no rent was paid. It becomes important, therefore, to determine what that period is.

Counsel for claimant insist that it begins with the 1st of June, 1908, the date of the first default, and the contention depends upon the language of the lease itself. There the lease covenants to "pay quarterly, on the 1st days of June, September, December, and March of each year, to the party of the first part, an annual rental of eight (8) per cent. on the par value of the capital stock of the party of the first part, such par value being $100 per share, and such capital stock consisting of 18,620 shares, for and during the first three years, commencing March 1, 1898, and 9 per cent. thereon for the remainder of the term and renewals." The quarterly payment thus reserved was, therefore, not payable in advance, but accrued at the end of the quarter, so that, when the receivers defaulted on the June payment in 1908 and thereafter, they failed to pay rent from March 1st of that year, and the period for which no rent had been paid would be from March 1st to November 13th.

Counsel for claimant demands the rent for this quarter ending June 1st, because the receivers had occupied without default up to that date. "They could not change the nature of their holding prior to default nunc pro tunc," it is said. So they also demand the franchise taxes for 1907 and 1908. The taxes, as reduced, are for 1907 $36,757.98, and $38,594.56 for 1908, and the Metropolitan's obligation to pay them is in the nature of a rental payment. The reason assigned for the demand for the quarterly rental clearly does not apply to this franchise tax for 1908, because that did not become due and payable until long after default, and after foreclosure of the Second Avenue properties was begun, and even after definite notice of rejection of the lease. Whether it applies to the 1907 tax suggests a different question, to be presently passed on; but so far as this quarterly payment (which at the 9 per cent. reserved amounts to $41,895), I think that the default must be held to relate back to the first day of the quarter. 'The claimant, as one of the lessor lines, had notice at the very beginning of the receivership as to the nature of the occupation by the court through its officers. It was not necessary for it to be a party to the litigations in order to know this, as in their reply brief counsel assert.

The court, as the opinions and orders cited shew, had directed payment of rentals under underlying leases tentatively only and "for the present," until the advantage of the leased line to the trust estate could be determined. This was its attitude toward the leased lines at the very beginning of the receivership, and as claimant's counsel urge, though in a different connection, it is to be assumed "that it [the Second Avenue Company] informed itself as to the attitude which the court and the receivers had taken with reference to the retention of its property." It is clear that from the beginning the nature of the holding, which counsel urge could not be changed, was experi-

mental only, even though for a short time the court did direct payment of rentals, and that it was subject to default at any time, and to the legal consequences which followed, so that in effect it was not changed. I think, therefore, that the claimant is not entitled to the rent installment accruing June 1st, but is limited to the net profits for that quarter, and that the period of the accounting is from March 1st of 1908 to the following November 13th.

The taxes for 1907 accrued on October 7th, the very day that the decree was entered directing their payment. The reason that they were not paid, unlike that in the case of the June rental, which the receivers had definitely determined not to pay, was because certiorari proceedings were pending to review them. Otherwise they doubtless would have been paid as the court directed. It would seem that the claimant is entitled to their allowances, as that should be regarded as done which should have been done.

The receivers in this case have filed their account of what they claim the receipts and expenditures to be from and for the Second Avenue lines for the whole period from September 24, 1907, to November 13, 1908. The claimant has attacked many of the items on both sides of this account for the long period. It has also submitted two accounts for the shorter period from June 1 to November 13, 1908; one based on its claim of what the account for the longer period should be, and the other on the figures given by the Metropolitan receivers in their account. Neither side has furnished any account for the period from March 1st to November 13th, but study of the briefs has convinced me that, when the contentions respecting the items for the long period have been disposed of, the basis for the account for the period named will have been determined, and the figures can readily be checked by the auditors for insertion in the report.

The first item of receipts objected to is the credit given for receipts from the Eighty-Sixth Street branch of the claimant's line of $55,628.23, which it is insisted should be $81,075.71. The claimant concedes apparently the justice of the actual service basis on which receipts from fares have been apportioned, which in view of the general transfer system prevailing during the period suggested a delicate and difficult problem. The receivers have divided the receipts of the Eighty-Sixth Street line, determined on this basis in the proportion which the length of track owned by the Second Avenue Company bore to the total length of that line which is 34.31 per cent. The claimant asks an equal division, because, as its eastern terminus was at the Astoria Ferry, it claims to have "controlled" the bulk of the business. Doubtless the great proportion of Eighty-Sixth Street passengers east and west were ferry passengers, but that fact should not, in view of the principle adopted in determining the receipts of all the Second Avenue lines, give the claimant a superior claim respecting this line. It did not own or control the ferry, and the replicant receivers for the same reason might with as much justice ask a departure from the basis of division adopted, for it undoubtedly furnished the bulk of certain business done at intersections of main Second Avenue lines with its own lines, as for example at Thirty-Fourth street and Second avenue, which is near the Thirty-fourth Street Ferry, and Twenty-Third, Fourteenth, and Eighth streets, which are near ferries.

The only other item of receipts that the claimant objects to is the division of the receipts for the period for the privilege of inserting advertisements in the street cars of the whole system. The total receipts were $267,843.70, and of this amount $30,005.15 are first allocated to the Second Avenue lines on the basis of the proportion which electric cars assigned to Second Avenue lines have to those assigned to the whole system during the period. This the receivers again reduce on the strength of the opinion of witnesses as to the relative purchasing power of those traveling on claimant's lines as compared with those using other lines, which is estimated to be about one-fifth, and which they say suggest a value for the advertising privilege which, reduced to dollars, would be $6,001.03. The reasons assigned give the opinion some plausibility, and I do not altogether agree with counsel for claimant that the subsequent experience of claimant's receiver respecting advertising in his cars proves the opinion to be wholly unfair. The fact that a contract for $23,333 per annum for more than two years was immediately entered into for advertising exclusively in Second Avenue cars is partly explained, and the other

tact that the outstanding contract is for $7,000 only certainly has significance, if I were permitted to consider it. I am, nevertheless, of the opinion, taking all the contentions suggested by the parties into consideration and the bases on which this account has been made up, that the car mileage basis of division should be applied to this item of receipts in simple fairness, just as it has been applied to the many items of expenditures incapable of specific allocation, where such application may result to the possible disadvantage of the claimant. I understand a division on that basis is $24,371.85, which, subject to verification, I adopt.

The next item of receipts suggesting contention is the amount of $23,930.07 for storage of cars in the Ninety-Sixth Street car house for this longer period, which claimant urges should be $28,362.62; but as the car house burned down in February, 1908, and no cars were stored there after March 1st, when the period of accounting is held to begin, this item is not considered.

The credits for rentals of tracks and ducts are conceded as claimed by claimant; the remaining credit for miscellaneous interest of $702.22 demanded by claimant being disputed. It is a division suggested by claimant of interest on bank deposits made by the receivers from September 24, 1907, to January 1, 1909; such interest amounting to $7,316.61 for the long period of occupation. The suggested division is in the proportion which cash fares on claimant's lines bear to the total cash fares of the system. Respondents point out that receivers on September 25, 1907, had cash in banks of $607,291.-33, which is larger than they had on hand at the beginning of any month thereafter, so that it seems impossible to attribute the interest to the difference, if any, between cash fares thereafter deposited and disbursements, rather than to this original balance.

Coming now to the items of expenditures in operation, the first to suggest dispute is that for maintenance of way, ordinary. Like many other items of expenditures made for the Metropolitan system generally, which benefited the Second Avenue lines, the item is incapable of specific allotment, because the Metropolitan books were not kept that way, and it has been determined on the car mileage basis, the general fairness of which the claimant concedes. Respecting this item the receivers insist that the amount is $106,-432.38, while the claimants urge that it should be diminished by $14,662.83 for certain items which it claims the evidence shows were not used on the Second Avenue lines during the longer period at all. If this be so, the deduction should be allowed, and the receivers' engineer does testify that those items were not used. Receivers urge that he was mistaken, and 'that the testimony of the assistant engineer shows that these items were used. The testimony of the latter respecting it leaves it in doubt, however. At most it is hardly more than an expression of belief that they must have been, and not a statement of positive knowledge and recollection. While it is possible that some expenditures may have been made on Second Avenue lines in the beginning of the longer period, it seems clear that during the period beginning March 1st none was, if testimony of claimant's witnesses is to be accepted. I therefore allow this deduction as claimed.

The next item in dispute is maintenance of equipment. It is divided into ordinary and extraordinary; the latter alone suggesting contention, as the former, apportioned on the car mileage basis, is accepted. As to this item of extraordinary maintenance, it is unnecessary for me to consider the arguments suggested in the briefs, since it has already been decided in the "motors" branch of this proceeding. Referring to the amounts expended for the rehabilitation of the 275 cars during this period of occupation, it was said that the fact would be reported "that the respondents expended $50,400 on the rehabilitation of the 100 open cars delivered, but nothing on the remainder, with the conclusion that the Metropolitan estate is entitled to credit for that amount." In their reply brief counsel for receivers assert that the master asked "whether this charge [for extraordinary maintenance of cars] was to be asserted in the motors branch, or the use and occupation branch, of this proceeding." What was asked was whether counsel had not claimed the charge in the motors proceeding—a very different question (see stenographer's minutes). It *was* claimed, sharply litigated, and decided as indicated, and I do not think that it should be reopened. It can be reported

as a credit in the motors branch, or as a charge against receipts in this branch, of the proceeding, as counsel may desire.

The next item is wages of car house employés. This is for wages of car house foreman, watchman, car placers, car shifters, car and motor inspectors, car cleaners, lamp and headlight tenders, car oilers, car stove firemen, trolley oilers, and other car house employés not engaged in making repairs or renewals. The receivers claim to be able to determine this on a specific basis, as they assert that on February, 1908, the accounts were kept in a way to show the expenditures for these purposes on cars of each line, and they claim $38,944.63. The claimants insist on an apportionment on the car mileage basis, admitting only $36,333.92, a difference of $2,607.91. Their argument in support of this contention loses much of its force after the destruction of the Ninety-Sixth Street car house by fire, and as the accounting is to be confined to a period subsequent to that event, the amount actually expended during the period of the accounting should be taken as the charge for this item.

The next item suggesting dispute is for tube cleaning, included under the head of "other charges," and the difference involved amounts to $1,234.61 for the long period. Claimants' contention is based on the contention that the evidence shows that little or no tube cleaning was done on two of the Second Avenue lines for the last two or three months of the period of occupation. On the whole, I think that the charge urged by the receivers on the car mileage basis should be allowed, as differences tend to equalize each other.

The next item is cost of power, for which claimant is charged for the long period $185,739.83. Claimant urges two other amounts: first. $114,975.98; and, second, $144,975. The former is less than the latter charge, because claimant insists that it is entitled to share in profits made by the Metropolitan estate by reason of sales of power to third parties. I do not agree. Claimant would have as much right to share in profits from the Broadway lines as from sales of power. The larger charge eliminates only two items from those on which the receivers' cost is based; those eliminated being depreciation in power house and substations and interest on investment. The objection is not to the amounts, but because the claimant insists that it has an interest in the power house under the contract of March 8, 1900, by which the Metropolitan Company, in consideration of $750,000 par of bonds of the Second Avenue Company, agreed to furnish the latter power at cost. The receivers, however, rejected this contract, and are not bound by its terms; and I think that the deductions, for the reason assigned, cannot be allowed.

The next charge is for legal and claim expenses in connection with injury claims; the amount in dispute being approximately $13,000. The receivers base this charge on opinion testimony that experience has shown that the expense of securing settlements amounts to about 50 per cent. of the amounts paid in settlement. I may not grasp it fully, but it seems to me that the claimants' theory, based on amounts paid to outside counsel, leaves many factors out of consideration, and is not as satisfactory as the theory, tested by experience extending over many years, and used on other systems. The charge as claimed is allowed.

Certain objections are made to the apportionment on the car mileage basis of general expenses, the first of which relate to law expenses; the amount claimed by the receivers being $7,582.90, and that allowed by the claimant being only $1,107.50. Claimant does not object to the basis of apportionment, but urges that it is applied to a total which includes many items that could not have benefited Second Avenue properties, which is, of course, true of all the general charges. These they eliminate from the receivers' total before applying the car mileage rate, and the greater part of the amount eliminated is the salary of the general counsel for the receivers. These latter rendered services in certiorari proceedings affecting Second Avenue lines, in the preparation of contracts, in the collection of insurance on large fire losses, in the severance of transfer relations with Third Avenue lines, in conferences with Second Avenue bondholders, and in other matters directly occasioned by the fact that the Second Avenue lines were part of the system.

219 F.—60

The charge asserted, determined on the car mileage basis, does not seem excessive, while that allowed is obviously too small. The receiver's charge is allowed, as are the two other charges claimed by him and objected to under this general heading, viz., salaries of general officers and miscellaneous general expenses.

The respondent is not entitled to charges for any taxes which were paid from Metropolitan funds which became due and payable prior to March 1, 1908. These were in the nature of rental payments, made under the direction of the court. Charges for taxes which accrued subsequent to that date and paid from Metropolitan funds are allowed. The gross earnings tax will be allowed at 1 per cent. on the gross earnings from March 1, 1908, to November 13, 1908, when and as determined.

The charge of $3,061.54 for wages accrued prior to September 25, 1907, is disallowed.

The foregoing passes on all items in dispute involved in the long period, and indicates what should and should not be included on both sides of the account for, the period of the accounting from March 1, to November 13, 1908, but does not, of course, determine specific credits and charges for the shorter period, nor the principle on which each should be deduced from amounts allowed for this longer period. Receipts from transportation for the period of the accounting should, I think, be allowed on the basis of actual service rendered, and those from advertising on a car mileage basis for the period. Specific charges allowed, which were incurred and paid during the period, fix themselves, and other charges as allowed, which were apportioned on the car mileage basis for the longer period, will be apportioned on that basis for the shorter period; the purpose being to apply to charges paid during the shorter period the same principle of apportionment applied to charges conceded or disputed and disposed of for the longer period.

Let the respondent receiver prepare and present an account for this shorter period in accordance herewith at a hearing to be had on June 24, 1914, at 2 p. m., on notice, if it suggest dispute.

### Motors Proceeding.

The order in this proceeding is intended to settle all questions unadjusted between the Metropolitan and Second Avenue estates arising out of the experimental operation of Second Avenue properties by Messrs. Joline and Robinson as officers of this court between September 27, 1907, and November 13, 1908. The purpose of that operation was to determine whether, as receivers of the Metropolitan Company, the respondents should adopt the lease of those properties to it, and it resulted in its rejection, as the direction of the order shows. Some of those questions the court by such order determined, among others, that the claimant Second Avenue receiver should accept certain electric cars, 275 in number, described in Schedule D annexed to the answer, as Brill closed, open, and combination cars, mounted on Brill maximum trucks, and equipped with G. E. 1000 motors, as constituting all the cars purchased with funds of the Second Avenue Company, except as the order thereinafter provided. Other matters, eight in number were referred for proof, to be reported with conclusions. Of these matters that numbered (6) in paragraph third of the order relates to the amounts, if any, payable to the claimant on account of net income from the operation of Second Avenue properties during this period, after deducting all proper charges, and by consent of counsel it has been conducted as a separate proceeding, known as the "use and occupation proceeding," pari passu with this proceeding, called for convenience the "motors proceeding," which includes all the other seven matters set forth in such paragraph. Though separately conducted, both proceedings are but branches of the one general inquiry commanded by the order, having for its object the determination of what property and money, if any, one estate owes the other as the result of this operation during the period in question.

The inquiry itself is governed by the principles established in these very proceedings by the decision of the Circuit Court of Appeals in the "termination of lease proceeding" (198 Fed. 721, 117 C. C. A. 503), which holds in effect that, whatever words of description they may have used, the respondents

during the period of experimental occupation must be considered as operating the leased road for the benefit of its owner. From this it results that losses during this period, whether from operation, or by destruction or depreciation of its property, are to be borne by the Second Avenue estate, and that expenditures for the benefit of that property from Metropolitan estate funds suggest credits to the latter and charges against the former which are clearly within the scope of the inquiry. No determination of net profits could be had which failed to take into account such losses and expenditures, and it is quite immaterial whether these latter be ascertained now or in the "use and occupation proceeding" which is but a part of that at bar. A further result of the decision cited is that a delivery of property by the respondents in compliance with the command of the court to the claimant, although depreciated by use by respondents, satisfies any obligation of the estate surrendering, and that the retention of property, by command of the court pending a determination of its title, is in no sense to be regarded as a conversion of that property, and a delivery now, if title be in claimant, in the condition in which it was at the time of the surrender of Second Avenue properties, would similarly satisfy such obligation. Thus it results that measures of damages which may be invoked in actions in tort and rules determining the propriety of set-offs and counterclaims in such actions have no application in an inquiry such as this.

Of the seven matters involved in this proceeding, those designated by the numbers (3) and (4) in the paragraph of the order mentioned have not been pressed, and are to be deemed abandoned. That designated as (5), involving the question as to whether the Metropolitan receivers were bound specifically to perform a certain contract of March 8, 1900, between the two companies, to furnish power at cost to the Second Avenue lines, was held on the hearings not to be binding upon them, as they had not elected to adopt it. The matters remaining for report at this time are those designated (1), (2), (7), and (8), hereinafter considered in that order; that designated as (6) and known as the "use and occupation proceeding" being left for future disposition.

(1) The inquiry contained in the order is "whether the Metropolitan receivers are under obligation to deliver to the Second Avenue receiver other motors and connections than those attached to the 275 cars at the time of their delivery, and, if so, on what terms said motors and connections should be delivered or the value thereof should be accounted for by said Metropolitan receivers."

The claimant receiver was appointed by the Supreme Court of New York, in a foreclosure action of the Second Avenue properties on September 19, 1908, instituted therein after this court had declined jurisdiction of a similar action. From such of the 275 cars, subsequently delivered in pursuance of the direction of the court above mentioned, as had what are known as "G. E. 57 motors" attached, the respondents on the following day removed such motors, and attached to each of said 275 cars two motors known as "G. E. 1000 motors"—550 in all, which were on the cars when delivered. The claimant insists that long prior to the New York City and Metropolitan receiverships the Second Avenue Company, through the acts of the Metropolitan and of the City Company as its lessee and sublessee, had acquired title to 550 of the G. E. 57 motors, and that therefore 550 of these latter should have been surrendered by respondents in place of, or in addition to, the G. E. 1000 motors attached to the 275 cars which by the court's direction they delivered at the expiration of the period of experimental operation on November 13, 1908. It is agreed by the parties that delivery of the actual motors is not at this late date convenient to either side, and that, assuming title as claimed, their value should under the order be accounted for. Much the greater part of the record to be reported in this "motors proceeding" is concerned with an inquiry as to such title and value, both of which suggest vigorous dispute on facts and law.

The lease of the Second Avenue to the Metropolitan was entered into on January 28, 1898, and rent began to accrue from March 1st of that year. Prior to its making, a change of motor power had been begun by the lessor company and was then in progress; contracts for the reconstruction of road and roadbed, as appears from recitals contained in the lease, having been

entered into previously by the lessor, but not apparently for its equipment. It appears, too, that the lessor, just prior to the lease, had mortgaged its properties to the Guaranty Trust Company to secure a proposed issue of $7,000,-000 of bonds, none of which had then been issued, and it undertook to issue and dispose of such bonds to an amount sufficient to meet such construction contracts. Further of such bonds it agreed, at the request of the lessee, to issue, sufficient "to supply suitable cars, rolling stock, equipment and motive power to its said railroad to enable the party of the second part [Metropolitan lessee] to operate the railroad hereby [thereby] leased and demised by the underground system of electricity or by any other motive power." The reconstruction of the roadbed had apparently been completed and operation begun by April of 1898, and at a meeting of Second Avenue directors held on May 11, 1898, there was presented a request for bonds by the lessee, accompanied by a statement showing expenditures for purposes within the language I have quoted, on which statement appear the two following entries:

Paid for 125 large box cars, Brill..............................  $325,000
Cost of 125 large open cars, ordered and to be paid for........   275,000

At a similar meeting upwards of a year later, on May 22, 1898, a similar statement, dated May 1, 1899, showing expenditures for similar purposes, was submitted and acted on, and it contained these items:

Cost of Car Equipment.

| | |
|---|---|
| 125 large box Brill cars................................. | |
| and | $642,000.51 |
| 125 large open Brill cars................................ | |
| 25 combination Brill cars............................... | 61,437.50 |

$703,438.01

These two statements suggest the inference that prior to May 11, 1898, the 125 large box cars had been delivered, as they had been paid for, and that prior to May 1, 1899, the 125 open cars mentioned in the first statement as ordered, with 25 combination cars, had likewise been delivered, as by the second statement they appear to have been paid for, and I understand that it is conceded that such an inference *is* suggested. It is also conceded that, when delivered, each of the 275 cars was equipped with two motors, and that the Second Avenue Company never thereafter paid for any motors, except those then delivered. There is, however, a sharp dispute as to what the motors delivered were. The respondents insist that they were G. E. 1000 only, and claim that fact, as matter of law, to be decisive of the controversy. The claimant, on the other hand, while not denying that, after the Second Avenue line was opened to electric operation in the spring of 1898, long cars were operated over it with the G. E. 1000 motors, insists that the evidence requires an inference that prior to May 1, 1899, the G. E. 57's had been installed, and are to be regarded as the motors included in the final payment of $703,438.01 above set out.

Careful reading of the testimony, however, convinces me that there is no justification for this latter inference. The evidence shows that about this time the Metropolitan Company was equipping, not the Second Avenue line only, but its whole system, with long double truck cars necessitated by the change to electricity then recently installed on others of its lines, or in process of installation, and that the method of acquiring the equipment was to purchase the bodies and trucks from the manufacturer and to assemble the complete car in its own shops by the addition of parts needed; that an estimate of the cost of the assembled car, made by Mr. Root about May 1, 1898, to which I attach more importance than claimant's counsel is willing to concede to it, includes motors at $780 per pair of motors, which, as I think the undisputed evidence shows, was the price of the G. E. 1000 motors, and that such estimated cost accords with the price at which the cars were billed as stated in the above-mentioned statements on which bonds were issued. It further shows that, compared with the number of G. E. 57 motors subsequently installed on long box, open, and combination cars used in the system as a

whole, the number installed prior to May 17, 1899, the date of the last billing, was insignificant, amounting to not more than 72, and this forbids any inference that the 57's were among those paid for, even if, prior to that date, some long cars equipped with such motors did pass over Second Avenue lines.

Neither do I think that Exhibits 26 and 27 lend support to the contention. The testimony of the auditor, correcting the testimony given by him before the court, mistakenly based on those statements, shows their precise value, and while they indicate the number of those motors in use at a later date, and are of much importance in that connection, they have no value as showing the number in use prior to May, 1899. I think it clear that the Metropolitan intended to demand and accepted payment and that the Second Avenue paid for G. E. 1000 motors only, and shall report that to be the fact to the court.

I do not, however, regard that fact as decisive of the controversy. By 1900 the inefficiency of the G. E. 1000 motors to operate long cars had been fully demonstrated, not only on the Second Avenue line, where the grades are steep and the conditions peculiarly difficult, but throughout the system generally, and G. E. 57's had been installed in their stead. It is a matter of inference from the evidence that prior to the lease of the Metropolitan to the City Company this change had been effected, and that thereafter neither the Metropolitan, its lessee, the City Company, nor the receivers themselves, attempted to operate the long cars, open, closed, or combination, with G. E. 1000 motors, or with any motors other than the G. E. 57's or their equivalent in power. It is difficult to read the evidence without concluding that both the Metropolitan and City Companies, long prior to the receivership, intended definitely to abandon the G. E. 1000's and to substitute motors of the G. E. 57 type of adequate power in the traction of long cars, and that the change had been completed long prior to 1905 the Exhibits 27 and 28, prepared for use in the franchise litigations of 1905, clearly show. It is true that there is evidence showing that changes were made in spring and fall of 57 motors from closed to open cars and vice versa, but there is no evidence that after 1900 the G. E. 1000's were used in the operation of long cars over the Second Avenue, or of any other of the long cars in the system.

It may well be, as counsel for respondents contend, that out of the 57 G. E. motors purchased by the Metropolitan, amounting to some thousands, it did not, by any definite act, actually segregate 550 as belonging to the Second Avenue Company, and as part of the equipment of 275 cars purchased for its account and paid for by it, any more than it seems to have segregated the cars themselves. Thus the cars paid for cover 125 closed, 125 open, and 25 combination, while those surrendered were 150 closed, 100 open, and 25 combination cars. What it did do was definitely to abandon the G. E. 1000's in long-car traction, and definitely to adopt the 57's, or their equivalent, for that purpose; and the question is whether, under the terms of the Second Avenue lease, these facts gave the lessor a right to the surrender of 550 of the motors, without which the cars surrendered could not be successfully operated, but for which it had not originally paid.

Provisions of the lease which is in terms of "cars, equipment, and personalty hereafter [thereafter] acquired," which are urged as relevant are that the lessee covenants that it will "keep the personalty hereby demised in good working order, condition, and repair, so that the traffic and business of said railroad shall be encouraged and developed, and reasonable accommodation given to the public," and that it "will deliver up the said railroad or railroads, and all the buildings, fixtures, and appurtenances thereof, at the expiration of this lease, or whenever the same shall become inoperative in good order and repair." It further agrees "that it will at the termination of this lease, or when for any cause it may cease to be operative, transfer, deliver, and return to the party of the first part, in good condition, the horses, harnesses, cars, tools, implements, machinery, equipments, stable equipments, office furniture and fixtures, and all property of every kind leased to and used by the party of the second part in the maintenance and operation of the railroad and railroads aforesaid, except that which is hereby absolutely transferred or which has passed from existence by death or destruction, and

shall also deliver the substitutes, increments, and additions provided or made by the party of the second part; and the substitutes for the property impossible to deliver by reason of death or destruction shall be equal in value to that for which they are substituted."

It may be said, in passing, that the construction of this language imposing an obligation to deliver substitutes insisted upon by the learned counsel for the respondents is one with which I do not agree. They urge that it is confined to substitutes for property which has passed from existence by death or destruction. The obligation to deliver substitutes, even though at the termination of the lease the property for which the substitution was made be still in existence, clearly results from this language; the obligation to deliver substitutes equal in value to property no longer existing evidently being intended as an additional protection to the lessor, but not as limiting the substitutes to the delivery of which the lessor shall then become entitled. Indeed, as to property still in existence, for which substitutes have been made, it would seem that the lessor becomes entitled to both. If, at the termination of the lease, the property for which substitutes had been provided were still in existence, the obligation to deliver both made any provision as to the value of either unnecessary; but, if it had passed out of existence, the substitute was to be equal in value to that for which it was substituted. Thus there is suggested by the language used a perfectly intelligible scheme for the lessor's protection when the lease ended, and it had again to discharge its duty to the public, as well as to the owners of its bonds and stock, to which the construction contended for does violence, and which, in my opinion, is not required by the language used.

Still other significant language contained in the lease, following the obligation of the lessor to issue its bonds for reconstruction and equipment purposes, is that "the party of the second part further agrees that after said railroad shall be reconstructed and the motive power changed, and the cars, rolling stock, and equipment provided, it will cause all renewals of such rolling stock, equipment, and motive power to be made at its own expense, and keep the same renewed and the said railroad supplied therewith."

The contention of the respondents is that, notwithstanding this language, the Second Avenue Company could have acquired title to the 550 G. E. 57 motors only if the Metropolitan intended it to, or by virtue of the rule of accession irrespective of intention, and that the Metropolitan did no voluntary act evidencing such intention; the rule of accession being inapplicable to detachable personalty, such as these motors were. The undisputed facts, however, are that as long ago as 1900 the Metropolitan had definitely abandoned the use of the G. E. 1000 motors in long-car traction, and had installed the more powerful motors on all such cars, including those used on the Second Avenue lines. This clearly was a "renewal" of equipment, which it is not denied experience had then demonstrated to be wholly insufficient, and, so far as this lessor company is concerned, it was, within the language quoted, a renewal of equipment, to be made at the lessor's expense, which the lessee was bound by its contract to meet. The record is entirely barren of any affirmative evidence that by installing 57's on long cars used on the Second Avenue lines the lessee did not intend to comply with its obligation, and I think that in the absence of such evidence it must be presumed that it did. The fact urged that it did not actually segregate 550 from all the 57's which it purchased, and affirmatively identify them as belonging to the Second Avenue Company, in no way affects such a presumption, for that they were not obliged to do while the lease was in force; the title of the lessor turning on the obligation to surrender substitutes, which is what I think these 57's were, whether actually segregated or not. Arnold v. Hatch, 177 U. S. 276, 20 Sup. Ct. 625, 44 L. Ed. 769.

If such a contention were to prevail, then the lessor did not have title to the 275 long cars delivered under the order herein, for these had not been segregated, and as those delivered were, as has been seen, not uniformly of the type paid for, they cannot be said to have been identified after their original purchase by any affirmative act of the lessor or its sublessee as belonging to the lessor company, so that the claimant's right to their delivery— a right recognized and enforced by the court—clearly did not turn on any

such act. What we have at the end of the period of occupation is that the respondents had in their possession motors sufficient in number and powerful enough to move all cars of the system of the type delivered, of which 550 motors—not, perhaps, theretofore apportioned to the lessor, in the sense that they were tagged as belonging to it—were in use on the Second Avenue lines when they took possession, had been in such use for nearly seven years prior thereto, and could not then have been identified as belonging to any other company in the system. In other words, I think it may fairly be said on the evidence here that the situation existed described by Judge Lacombe on the Central Park Company's application ([C. C.] 165 Fed. 474), where he held, respecting cars and horses not previously identified as belonging to that company by any affirmative act of the lessee or sublessee, but in use on the line when receivers took possession, and not capable of identification as belonging to some other lessor, that such property should be assumed to be "substitutes" to be returned to the lessor when the road itself was returned. Indeed, if it had not been for the facts that the 550 G. E. 57's cost considerably more than the G. E. 1000 motors, and that the Second Avenue paid for the latter only, I doubt whether, in the discharge of the duty which they owed to the Metropolitan estate, the respondents would have felt compelled to raise any question as to the claimant's right to the surrender of the former as substitutes because of any difficulty in identifying them as such. Precisely the same difficulty existed as to the 1000 G. E. motors actually delivered, for none of these had been attached prior to September 19, 1908, to the cars delivered, but had been in use generally in the system, either on small cars or for the most part on snowplows and the like. As I think that the language of the lease bound the lessor to renew inadequate equipment at its own expense, substituting therefor that which was adequate, and that its acts long prior to the receivership require the presumption that in installing 57's it intended to comply with its obligation, I shall report a conclusion to the court that the respondents were under an obligation to deliver 550 G. E. 57 motors.

As it is agreed that it is not now convenient to deliver such motors and connections, the remaining question under the order is on what terms their value should be accounted for. If there were now in the possession of the respondents 550 G. E. 57 motors, their delivery in the condition in which they were at the end of the period of experimental operation would fulfill any duty which the respondents as conservators of the estate now represented by the claimant owed to it. Obviously the value to be accounted for is the value of the motors in the condition in which they then were, and, if that value had been depreciated by use by lessee, sublessee, or respondents themselves, the loss is one which, under the principles referred to, the estate represented by the claimant must bear. Values based on what respondents may have said it would cost to furnish adequate motor equipment on the 275 cars delivered, or on the actual cost of such equipment to the claimant, or on measures of damage, either punitive in their nature, or based upon the fact that the property converted was of special value to the owner, applicable in actions of conversion, have clearly no application. As has been said, there was here no conversion, nor anything but a detention of property by direction of the court until its title was determined—a detention clearly demanded by the duty which the respondents owed to the estate of the Metropolitan Company, as the recital of the foregoing facts suggesting the reasons for it abundantly shows.

The evidence, of course, is that the G. E. 57 motors in the Metropolitan system had been depreciated by a use of nearly 10 years, and the respondents adduced the testimony of their superintendent of rolling stock, who had a general knowledge of their condition at the end of this period of experimental operation, and who testified that their value at that time, determined by a yearly deduction for depreciation, estimated in accordance with the best railroad practice, as to which he showed himself fully qualified to speak, was $570 per car, or $285 a motor. Some light is thrown on the fairness of this estimate by the evidence offered pro and con on the theory that secondhand motors in fair operating condition had a market value at this time, which is not, however, conceded by the claimant, who insists that about November

13, 1908, the supply was so limited that they cannot be said to have had a. market value then. However this may be, considerable quantities of these secondhand motors were on the market just prior to that date, and some time subsequent thereto, and on the evidence of experts the contention of the respondents is that the value of such motors was not more than $225 a motor, while the respondent insists that it was $350, between which limits there are other varying estimates.

While I do not think that the theories of damages in support of which this evidence was supplied are necessarily controlling, it indicates that the figures suggested as the result of an application of the independent method applied by the respondents' superintendent, by which, I think, the respondents, having offered it, should be bound, suggest the usual approximation adopted by triers of the fact of value based on conflicting expert testimony, being about midway between the two extremes. I have no hesitation in accepting it independent of this evidence, and shall report the value to be $285 for each of the 550 motors, or $156,750.

The respondents insist, however, that any amount arrived at as representing this value must be diminished, first, by the amount actually expended in putting 550 G. E. 57's in good secondhand operating condition, which they claim to be $28,900; second, by the cost of rehabilitating the 275 cars delivered to the claimant, which they estimate as $118,581.25. I may say generally that the right of respondents to credit for Metropolitan moneys actually expended by them on Second Avenue property during the period of experimental operation is undoubted on the authorities already referred to, and that such credits are within the scope of the order of reference under one or the other of the subdivisions of its third paragraph, subject, of course, to the limitation that they be allowed but once. They are not to be rejected from consideration in this connection, as claimant's counsel insists, because they are offsets based on contract, express or implied, to a claim sounding in tort, for the reason already suggested, and may be as properly considered now as in the "use and occupation proceeding" to which he would refer them, since that, though independently conducted, is but a part of this proceeding.

Taking up the first of the deductions insisted on, it will be noted that the method adopted by respondent's expert which suggests the figure to be reported as the value of the motors proceeds upon a theory which excludes any expenditures for rehabilitation, so that, as claimant is not to get the motors, it should not be deducted; that in effect having already been done. As to the second item of $118,581.25, it is based again on the testimony of Mr. Adams, respondents' superintendent of rolling stock, upon an estimated apportionment of actual expenditures in rehabilitating closed and open cars in the system during 1908, which fixes $555 as the amount expended on each closed car and $504 as that expended on each open car.

Counsel for claimant urges, among others, two objections to its allowance. One is that it is merely an estimate. The evidence shows, however, that it is based on the actual expenditures; the amount expended on each car having of necessity to be apportioned, as the work for the most part was done in respondent's own shops. I have no hesitation in accepting the figures suggested as fairly representing the amounts expended per car on cars of each type actually rehabilitated. The second objection is that there is no evidence in the record at bar to show that any moneys were actually expended by the respondents on any of the cars delivered by respondents under the order herein. Careful reading of the record convinces me that this statement of counsel is accurate. It is shown that expenditures on a large number of long cars were made, but not on all the cars then in the system, and it cannot be assumed that any were made on the cars delivered. I may, however, take notice that this question of fact was litigated between the same parties in the Second Avenue breach of lease proceeding and that the finding of fact reported to the court, and confirmed by it, contains the direct statement that 96 of the open cars delivered were thoroughly rehabilitated in the summer of 1908, and suggests the inference that the other 4 had been, too, although when they were delivered their platforms were lacking. It suggests the further inference that none of the other 175 cars had been rehabilitated by the respondent receivers at all after they took posses-

sion on September 25, 1907, and up to the date of delivery (see master's opinion).

This finding and the order of the court confirming it, which is, I take it, conclusive on the parties here, have not been offered in evidence in this proceeding, and an opportunity will be accorded to offer it before the report herein is signed. It will be the basis of a finding of fact to be reported that the 100 open cars delivered had been rehabilitated by the respondents during this period of experimental operation, and that no moneys had, during that period, been expended by them on the remaining 175 cars delivered. The testimony of the respondents' superintendent of rolling stock in this proceeding' that $504 represents the amount actually expended in the rehabilitation of each open car is accepted, and I shall report the fact that the respondents expended $50,400 on the rehabilitation of the 100 open cars delivered, but nothing on the remainder, with a conclusion that the Metropolitan is entitled to credit for that amount.

The respondents claim a further credit of the value of the 550 G. E. 1000 motors delivered with the 275 cars on November 13, 1908. I think that under the lease, at its termination, title to property then in existence for which other property had been substituted in accordance with its terms remained in the lessor. The respondents do not question that title to *these* motors was in the lessor, for that is their assertion. The reason for this conclusion has been given in connection with the language of the lease which suggests it, and it of course means that the Metropolitan estate is not entitled to this credit. It will, however, be convenient to report the value of these motors to the court in the event that it differ, and this the evidence in connection with certain findings by the court in the Second Avenue breach of lease proceeding between the same parties enables me to do. The evidence shows that there was a market value for secondhand G. E. 1000 motors in good operating condition on the date of delivery of $100 per motor, which figure I adopt. The value of 550 of such motors in that condition would therefore be $55,000.

Respondents suggest that sums were expended by them in rehabilitating the motors delivered, and say they were in such condition when delivered; but I think the evidence shows the contrary. In any event, it has been found as a fact by the court in the proceeding referred to that they were badly out of repair on November 13, 1908, and that $78.25 *per pair* would be needed to put them in that condition. The total cost of such rehabilitation at that time for the 550 motors at that rate would be $21,518.75, which should be deducted from the value of $55,000 fixed for such secondhand motors in good condition, leaving $33,481.25 as the value of the secondhand motors as and when delivered, which will be reported as a fact, with the conclusion that the sum suggested is not a charge against the estate represented by the claimant.

The answer to the question asked by the court in subdivision (1) of paragraph third of its order will therefore be that the Metropolitan receivers were under obligation to deliver to the Second Avenue receivers 550 G. E. 57 motors in addition to those attached to the 275 cars at the time of their delivery on November 13, 1908, and that, as it is agreed that they cannot now be delivered, the terms on which their value should be accounted for are that the estate represented by the latter should be credited with $156,750 as the value of said motors in the condition in which they were on November 13, 1908, the date when they should have been delivered, and that the Metropolitan estate represented by the respondents is entitled to an offsetting credit to the extent of $50,400, being the amount expended on the rehabilitation of 100 of the 275 cars delivered during the period of their experimental operation of the Second Avenue properties between October 1, 1907, and November 13, 1908.

(2) Whether the Metropolitan receivers are under obligation to pay over to the Second Avenue receivers any sums on account of the property that was destroyed or damaged by the fire at the car barn of the Second Avenue Company at Ninety-Sixth street and Second avenue on February 29, 1908; and, if so, what amount and upon what terms?

The date of this fire, it will be noted, was subsequent to the appointment

of the respondents, and during the period of experimental operation by them of the Second Avenue properties. The agreed value of the car house at the time of the fire is $525,000, and the damage to the building $309,258. The insurance companies agreed to pay $227,000, which the parties agree was all that could be collected under the policies. The actual amount collected and turned over to the claimant was $203,299.48. A further sum of $15,716.24 was collected by respondents and retained pending the determination of the ownership of a fire protection system installed by them prior to the fire. Counsel now agree that this system, when installed, became fixtures, which means that they were the property of the Second Avenue Company, so that the right of claimant to this fund of $15,716.24, which was placed in the Astor Trust Company, with accumulated interest, is conceded. On January 1, 1912, the interest credited was $1,167.49, which added to the principal is $16,883.73, the sum demanded for claimant in the brief of counsel. He is of course entitled to such further accumulations as there may be. Certain drafts for the balance of the amount agreed to be paid by the insurance companies were protested, which amounted to $6,295.28, to the Metropolitan rights in which it is agreed that the claimant is entitled to be subrogated.

Claimant insists, however, upon a credit either of the difference between the amount of the fire damage and the amount of the insurance collected which he states to be $105,958.52, but which should now be diminished by the above-mentioned amount of $15,716.24, leaving $90,242.28, or the difference between the amount expended by him in the reconstruction of the car house, which was $465,700.20, and the amount of the insurance collected, stated at $203,299.48, leaving $262,400.72, but which should now be similarly diminished by the same sum, leaving $246,684.48. The respondents say that this matter is not referred, and I agree. The court below, long before the decision of the Court of Appeals in the "termination of lease proceeding," had held that losses occurring to property leased, during a period of experimental operation prior to the rejection of the lease, were with the lessor ([C. C.] 165 Fed. 474, supra), and the language of its order is not to be extended by construction to include a matter about which there could be no dispute.

If it be referred, however, the loss is clearly one which the Circuit Court of Appeals has held that a lessor must bear.

The answer to be made to question (2) will therefore be: The Metropolitan receivers are under obligation to pay over to the Second Avenue receiver on account of property that was destroyed or damaged by fire at the car barn of the Second Avenue Company at Ninety-Sixth street and Second avenue on February 29, 1908, the sum of $15,716.24 deposited in the Astor Trust Company, with all accumulations of interest credited thereon by said Trust Company, and that said Second Avenue receiver is entitled to be subrogated to the rights of the respondents in the unpaid and protested drafts issued by the insurance companies, amounting to $6,295.28.

As no claim is made under the questions proposed in subdivisions (3) and (4) in the paragraph third of the order, the report will so state.

(5) Whether the Metropolitan receivers are under obligations specifically to perform a certain contract, dated the 8th day of March, 1900, executed by the Metropolitan Street Railway Company, party of the first part, and the Second Avenue Railway Company, party of the second part, whereby Metropolitan Street Railway Company agreed to furnish power at cost, and, if so, upon what terms?

The answer to this question is in the negative, and will be reported accordingly.

(7) What are the rights, if any, of the receivers of the New York City Railway Company and of the Metropolitan receivers by reasons of moneys expended subsequent to their appointment in putting the First Avenue line of the Second Avenue Company between 59th street and 125th street in fit condition to run, and by reason of their expenditure of other moneys in and about the property of the Second Avenue Company?

The contention of the learned counsel for the claimant that the Metropolitan Company by the lease assumed the payment of the bonds which it became entitled to demand by reason of expenditures of the nature indicated

in the question has been disposed of adversely by the court in the Second Avenue breach of lease proceeding. In any event such expenditures, when made by respondents, would stand on a different footing from those made by the lessee itself for such purposes. The further contention that the Second Avenue Company is not bound by the proceeding in which the expenditures were authorized, as it was not a party to them, is also answered adversely by the reasoning of the opinion of the Court of Appeals in the "termination of lease proceeding" (198 Fed. 721, 117 C. C. A. 503), which rules that such expenditures, especially for betterments, as here, when authorized by a court having jurisdiction of the res, are binding on the owner lessor, even though not a party, for it could have become such. The Second Avenue Company will get the benefit of the betterments, for which it would be inequitable to compel the Metropolitan creditors to pay. So, too, under that decision it would seem that respondents are quite as clearly entitled to a lien for such expenditures superior to the lien of the mortgage of the Second Avenue Company to the Guaranty Trust Company, as the holders of receivers' certificates would have been, had such been authorized by the state court having jurisdiction of the action in which the claimant was appointed, and their proceeds devoted to the same purposes.

As to the suggestion that these payments subsequent to the receivership of October 1, 1907, might have been used as a set-off in the Second Avenue breach of lease proceeding—to my mind an altogether doubtful proposition—it is sufficient to say, again on the authority of the "termination of lease proceeding" that, not having been urged there, they are available here as credits to the Metropolitan estate arising out of things done during the period of experimental operation against any offsetting charges similarly arising and are clearly within the inquiry commanded by the order.

Finally, to the suggestion that they are available only in the so-called "use and occupation proceeding," which means that they are payable only out of net earnings, if any, accruing during the period of experimental operation, and that they may not be repaid at all, it may be said that it can be based only on the theory that to allow them as a credit against a debit for the value of the motors is to allow an offset based on contract against a claim sounding in tort—a theory which has already been considered and rejected, for reasons stated.

Claimant interposes objections to certain items included in this cost of electrification of First Avenue. The first of these relate to the remodeling of the First Avenue section of the Ninety-Sixth Street car house, necessitated by the change in motive power and in installing fire protection apparatus, amounting to $78,153.82. It proceeds upon the theory that, as there is no express provision for it in the order of the court authorizing the electrification of the First Avenue line, it should not be allowed; but I think that the authority for it was implied. So with reference to a second sum of $1,507.32 for manholes, objected to on the same ground, I think the authority to construct these, as a necessary incident of the change to electric traction, was also implied.

A third objection is to an item of $2,025 for steel drawings for the remodelling of the section of the car house referred to, which were ordered by the respondents during the period of experimental operation, before, I assume, they had determined to reject the lease. They were ordered in good faith, of course, on the assumption that the duty of making the change might devolve upon them. They did not make the change, however, as this was done by the claimant, and he did it on plans from others that he himself secured. This objection seems to be based on alleged facts that the claimant never had the plans and could not get them, but it is clear on the evidence that if he had gotten them he never would have used them, as he had determined to make the change in his own way. I think that, on the authority of Ames v. U. P. R. R. Co. (C. C.) 74 Fed. 335, the item is properly chargeable against the Second Avenue estate.

The last item objected to relates to the alleged cost of "clearing up car house ruins" after the fire, amounting to $30,047.27, included in the total credit claimed under this heading. The figure given is part of a larger cost for the removal, not only of building debris, concededly chargeable only

to the Second Avenue Company, but of car débris as well, which is chargeable solely to the Metropolitan estate. It is an apportionment based on the testimony of respondent's accountant, and is larger than the figure of $20,000 for the same item reached by the insurance adjusters. Both are of necessity estimates, but for the reasons suggested in his testimony I accept the conclusion of the accountant, whom have I found in these proceedings to be not only accurate, but fair.

The respondent's brief states the matter respecting this item as follows:

| | | |
|---|---:|---:|
| Clearing up car house ruins..................................... | $30,047 | 27 |
| Adjusting loss.................................................. | 1,945 | 27 |
| Legal expenses................................................. | 348 | 25 |
| Restoration of property........................................ | 10,581 | 55 |
| | | |
| | $42,922 | 34 |

Less Credits.

| | | | | |
|---|---:|---:|---:|---:|
| Deposit of insurance moneys................... | $15,716 | 24 | | |
| Salvage ....................................... | 10,353 | 98 | | |
| Legal expenses paid........................... | 181 | 57 | 26,251 | 79 |
| | | | | |
| Balance .......................................................... | | | $16,670 | 55 |

This item of insurance deposit of $15,716.24 has been allowed as a credit to claimant in the answer to the second of the questions referred, and should not be again allowed. Accumulated interest was also allowed. This balance should therefore be increased by this amount, making the item for "clearing up car house ruins," $32,386.79. The total amount of the affirmative claim of respondents against claimant will then be as follows:

| | | |
|---|---:|---:|
| Electrification of First Avenue line......................... | $173,682 | 43 |
| Remodeling of First Avenue section of car house and installation of fire protection.................................... | 84,110 | 48 |
| Removal of car house débris................................. | 32,386 | 79 |
| | | |
| Total ........................................................ | $290,179 | 70 |

The answer to the question proposed in subdivision (7) of the order will therefore be: The respondents, as receivers of the Metropolitan Street Railway, are entitled to a credit of $290,179.70 by reason of moneys expended subsequent to their appointment in putting the First Avenue line of the Second Avenue Company in fit condition to run and upon the property of that company, and are entitled to a lien for the balance of such sum, if any, after deducting credits to the claimant allowable as the result of this proceeding, with interest at 6 per cent. from November 13, 1908, and to a lien for such balance on the property of said company prior to the lien of its mortgage to Guaranty Trust Company.

(8) What ducts and feeder cables located on franchises belonging to the Second Avenue Company belong to the Metropolitan Street Railway Company?

By stipulation the question of ownership of the ducts was reserved, unless the New York Railways Company required its consideration, which it has not done. The respondents, at whose instance, doubtless, this paragraph was inserted in the order, insist that what are known as the "A. C." or alternating current feeder cables in the ducts along the Second Avenue lines belong to the Metropolitan estate, but concede that what are known as the "D. C." or direct current feeder cables feeding Second Avenue lines belong to the claimant.

A. C. cables were used in conveying alternating or high tension current from various power stations owned or controlled by the Metropolitan System, none of which was owned by the Second Avenue Company, to various substations in different parts of the city, none of which, as is stipulated, belonged to the latter company. In these power stations the alternating current is converted into direct current and conveyed by the D. C. cables, mediately or immediately, to ducts along the lines in the operation of which the direct current which they carried was used. A. C. cables, which were carried in

ducts along the Second Avenue line, were used for the most part in conveying the alternating current from a power house on First avenue and Ninety-Sixth street to these various substations, and such cables are used solely for that purpose. The Second Avenue ducts used to carry any of these A. C. cables were only a link in the chain of ducts needed to carry it from power house to substation, for none of these substations was on the Second Avenue lines. These A. C. cables were installed in the ducts by simply drawing them through from manhole to manhole, which are about 400 feet apart, and there splicing them. They are not attached, so as to be irremovable, and can be readily drawn out. They are susceptible of ready identification, and are in fact identified by a metallic tag bearing a number. The uncontradicted evidence shows that they were paid for by the Metropolitan Company, and not by the Second Avenue Company, which did, however, pay for the D. C. cables from the substations serving its own line, ownership in which is conceded. The Metropolitan also used these ducts to carry D. C. cables from substations to lines in its system other than Second Avenue lines, which it paid for, and which, too, are removable and capable of identification.

The learned counsel for the claimant urges that these cables, whether paid for or not, became fixtures when they were threaded through the ducts. Whether personalty takes on the legal characteristics of real property depends as much upon the intention of the parties between whom the question arises as upon anything else, and the intention which the facts suggest, or which the law declares that they suggest, controls. Here it cannot be assumed, so far as the A. C. cables are concerned, which were not charged to the Second Avenue Company, and which were useless to it, as it owned neither power house nor substation, that the parties intended that title should vest in it simply because a portion of such a cable on its way from power house to substation was passed through ducts on its line; and the same is true of D. C. cables to lines other than Second Avenue lines, which the line using them paid for, and which happened to pass in part through Second Avenue ducts. Such facts suggest only a contrary intention. Neither do I think it of any importance whether such A. C. or D. C. cables happened to be in the ducts at the time the Second Avenue lease went into effect. It is inferable from the evidence that the Metropolitan, while not nominally, was actually, in control of the work of electrification then in progress and begun in anticipation of the lease, and if it strung cables through these ducts for use on other lines for which the Second Avenue was never asked to pay, and for which it would not under the lease have been bound to pay, that fact would not be sufficient to give the claimant title.

Subject to criticisms of counsel as to form, I suggest the following answer to the question (8) contained in the order: The question of the title to ducts located on franchises belonging to the Second Avenue Company has been reserved by stipulation. All alternating and direct current feeder cables in such ducts, except such direct current feeder cables as were paid for by the Second Avenue Company, and which are shown in Respondent's Exhibit JJJ in this proceeding, with that portion of two feeder cables numbered 127 and 128 in ducts on First avenue, from Ninety-Sixth street to Eighty-Sixth street, and on Eighty-Sixth street from First to Second avenue, belong to the Metropolitan Street Railway Company; the alternating current feeder cables being shown in Claimant's Exhibits 34b, 35, and 36, of January 1, 1913.

Respondents will file and serve a proposed report accordingly; claimants to file and serve objections and proposed amendments thereto within ten days after such service, to be passed on at a hearing thereafter, on a date to be fixed at convenience of counsel.

John W. Griggs, of New York City, for claimants.

Strong & Mellen, of New York City (Charles H. Strong, of New York City, of counsel), for receiver of Second Ave. R. R. Co.

Masten & Nichols, of New York City (Arthur H. Masten and William M. Chadbourne, both of New York City, of counsel), for receiver of Metropolitan St. Ry. Co.

LACOMBE, Circuit Judge. This claim has been treated by the special master in two separate opinions, viz., "Use and Occupation Proceeding" and "Motors Proceeding." As a single report covers both, they will be disposed of here in a single opinion.

[1] 1. The main discussion is on the question whether the Second Avenue is entitled to recover rental (taxes being considered rental) stipulated in the lease for the entire period of occupation by receivers, or, as the special master held, for a part of that period, or the net earnings of the property during the entire period. Whatever may have been held in other cases, many of which are cited on the briefs, and none of which it is thought precisely fit the complications of this particular system, it seems to me that the several deliverances of the Circuit Court of Appeals in the above-entitled causes have settled the question for this court. As to each and every one of the many leased lines, "unless and until [receivers] adopt the lease, there is no privity [between lessor and receivers] and no liability upon the lease." 198 Fed. 721, 117 C. C. A. 503. From the very beginning, all these lessors knew that the whole system was in receivers' hands, and knew that the latter were under no obligations to pay stipulated rental. If they were unwilling to have their property used and occupied under such an arrangement, which might end in their receiving net earnings only for such use and occupation, the court was open to them for application to have a prompt determination made as to whether the lease would or would not be adopted. None of them made such application, for the very good reason that they well knew that these rentals were all fixed in more prosperous times at high figures, amounting to more than could then be earned from the operation of the roads. Presumably it was hoped that with the lapse of time conditions would improve, and that either receivers or a reorganization company would eventually adopt the leases.

It might well be better to wait in uncertainty rather than to force a decision which would convert the uncertainty into a disastrous certainty. There seems to be no special equity which should call for a modification of the rule laid down by the Circuit Court of Appeals. The amount to be paid for use and occupation by receivers from September 25 to November 12, 1908, when the road was turned back to the lessor, is the net earnings of the road for that period. The total revenue from the operation of the road should be first ascertained, and from it should be deducted the proper charges against such revenue; the result will be the net. Although all the figures were before him, the special master has apparently made no finding as to all of these items of charge and countercharge, except for the period from March 1, 1908, to November 12, 1908. In consequence it will not be possible for this court itself to determine the amount; the case will have to go back to the special master, with a statement of the opinion of this court as to various controversies which have arisen on the accounting.

[2] 2. In figuring as he did the amount of receipts for the shorter period, the special master prorated total receipts on the basis of mileage. It is objected that there should be a larger allowance to the Eighty-Sixth Street (branch) Line, because its eastern terminus was the

Astoria Ferry, which claimant insists "controlled" a large part of the business. The master's method is the only practical one; the other proposed method involves too many speculative elements.

3. Receivers contended that the pro rata of receipts from advertising in the cars should be reduced, on the theory that the advertising of the Second Avenue was only one-fifth the value compared to the rest of the system, because "the purchasing power of the passenger" determines the value of the line for advertising. This also is too speculative; the master's method of determining these receipts was correct.

This disposes of all items on the one side of the account. Next to be considered are the items in controversy on the expenditure side of the account.

4. The first of these treated of in the report is "Maintenance of Way, Ordinary." It seems entirely clear upon the evidence that the amount of that can be determined only on the car mileage basis. The master so finds, although he does not give the figures for the full period. He allows, however, a deduction of $14,662.83, as his conclusion from conflicting testimony. In controversies concerning the large sums involved here, it would be a waste of time, costing more in the end to every one, to go into the details of so small a sum. The master's finding is approved, but if, when it comes to a question of deductions from the pro rata for the longer period, claimant undertakes upon evidence already in to increase the amount of this deduction to a more substantial sum, this court will consider the whole amount of the claimed deduction open, and will examine into it.

It is understood from the opinion that the item "Maintenance of Equipment, Ordinary," is not in dispute.

5. The next item is "Maintenance of Equipment, Extraordinary." By reason of the unfortunate division of this single claim into two proceedings, the master seems to have concluded that he could not make an allowance for this amount. It is therefore referred to him to find what is the amount of such expenditures, directly chargeable on the proof to Second Avenue equipment for the whole period, exclusive of the motors, which will be referred to later on.

6. The next item is "Wages of Car House Employés." There does not seem to be any objection to the master's finding of this amount, and it is approved. Whether accounting for net earnings during the full period will produce some exception to his ruling cannot be told, until the accounting on that basis is concluded.

7. The next item is for "Tube Cleaning," as to which there seems to be no exception to the master's finding, which is for the full period, and which is affirmed.

8. The next item is for "Power Charges" during the long period. No argument against his finding is presented, and it is affirmed.

9. The same disposition is made of the item "Legal and Claim Expenses" for the same reason. Also general expenses—prorated on mileage basis.

[3] 10. The next subject of controversy is the motors G. E. 1000 and G. E. 57. The subject is most fully and carefully discussed in the master's separate report, "Motors Proceeding." His conclusion that

the receivers should have turned over to the claimant the motors of the later type, which, before their advent on the scene of operations, had been substituted for the older type as more efficient, is entirely correct. So, also, are his findings as to value; it being agreed all around that physical delivery is undesirable now. It is understood that $156,750 represents the value in November, 1908, when equipment was turned over, and these G. E. 57 motors should have been. · Receivers, however, were bound only to turn over the substituted motors in the condition in which they found them. If they spent money to put them in an improved condition at the time when they should have turned them over, but did not turn them over in the condition in which they were in September, 1907, that would be a proper reduction.

To the proposition that claimant is to have its semiobsolete motors, as well as the higher type motors which have been substituted in their place to make its cars more efficient, I cannot assent. This conclusion is based solely on the text of the lease, which provides that on termination the lessee will return equipment, except what has passed from existence by death or destruction, and also substitutes, increments, and additions. As construed, this would lead to the following result: Having received a small car carrying 20 passengers and a team of horses worth $200, the lessee substituted a larger car carrying 40 passengers, which this team of horses was too light to haul. Therefore it bought a new team of heavier horses worth $300, and substituted them for service on this road, turning over the lighter team to other branches of the system, where the lighter cars were still run. The clause as construed would require the lessee to turn over, not only the more valuable new team, but also the old team, for which the new had been substituted, unless it had taken the precaution to shoot the new team the day before the lease terminated, so that "death or destruction" would eliminate them from further consideration. There is no argument in the briefs—other than the text of the clause—to support this construction, and I find it so difficult to conceive that intelligent men would have agreed on such a contract, for no obtensible reason, that it is much easier to conclude that the draftsman of the document was not gifted with the faculty of clear expression in his use of language. Quite possibly he drew a perfectly intelligible and intelligent paragraph, into which amendments, intended to cover some special points, have been so inartificially injected as to distort its meaning.

The proper construction seems to be this: If the particular piece of equipment still exists and there has been no substitute installed, it is to be returned. If there has been a substitute installed, that is to be returned. If the substitute is less valuable than the original, the lessor shall have his original, not the inferior, substitute. If the original has perished, so that he cannot get it, then to the returned substitute there must be added enough money to make it equal to the original. Therefore from the $156,750 there should be deducted the value in November, 1908, of the G. E. 1000's turned over.

11. The master's conclusions as to the item of claim on account of the destruction of the car barn at Ninety-Sixth street are fully concurred in.

12. There does not seem to be any contention that the master erred in his conclusions as to furnishing power; they are confirmed.

[4] 13. The master's conclusion as to the offset by receivers of the amounts *they* expended for electrification of First Avenue Line, etc., are fully concurred in. The decision of the Circuit Court of Appeals in the constroversy between lessor and lessee requires no different disposition of this item. Receivers occupy a very different position from that of the lessee. They expended general funds for the express benefit, and, since the lease was not adopted, for the sole benefit, of the Second Avenue, and it would seem grossly inequitable that the latter should have its property thus improved at the expense of all others interested in the fund.

14. The master's conclusions as to ducts and feeder cables located on franchises are also affirmed.

15. It is found on the proofs that the amount due by receivers for use of surplus space in Second Avenue car house during the period of occupation is $28,362.62.

As stated before, the entire subject-matter of this claim, argued here in two subdivisions, is sent back to the special master for a revised report in conformity to views above expressed. It might be possible, with the assistance of some concessions on both sides as to figures, to amend the findings and conclusions on the record now here. But the items are so numerous, and there is such a mass of detailed figuring, that it would be unsafe to do so, and much time would be lost in the attempt; the special master, being thoroughly familiar with the details, can dispose of them more accurately and expeditiously. Especially so because the sending of the case back to him for reconstruction of the report on the lines indicated in this opinion will not necessarily open the door to the taking of any additional testimony, except as indicated. When his revised report comes here, it may be affirmed pro forma; all exceptions to the original and the revised report being reserved to objectors. It may then go to the Court of Appeals.

A decretal order may be entered, recommitting the report to the special master for revision in accordance with the views expressed in this opinion.